1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

| | |
|---|---|
| FACEBOOK, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>9 XIU NETWORK (SHENZHEN) TECHNOLOGY CO., LTD., et al.,<br><br>Defendants. | Case No.  19-cv-01167-JST (AGT)<br><br>**REPORT AND RECOMMENDATION TO DENY PLAINTIFFS' MOTION TO AUTHORIZE SERVICE ON CERTAIN DEFENDANTS BY E-MAIL**<br><br>Re: Dkt. Nos. 36, 41 |

7
8
9
10
11

12          Facebook and Instagram (referred to here collectively as Facebook) have asked the Court

13    for permission to serve two China-based defendants by e-mail.  Their request comes after an

14    unsuccessful attempt to serve these defendants through the Hague Convention on the Service

15    Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965,

16    20 U.S.T. 361, 658 U.N.T.S. 163 [hereinafter the Hague Service Convention or the Convention].

17          Judge Tigar, the district judge presiding over the case, referred Facebook's motion to the

18    undersigned for a report and recommendation.  That report follows, and with it the

19    recommendation that Judge Tigar deny the motion and not permit service by e-mail at this time.[1]

20                                                    **I.**

21           The United States and China are both parties to the Hague Service Convention, a

22    multilateral treaty whose purpose is "to simplify, standardize, and generally improve the process

23    of serving documents abroad."  *Water Splash, Inc. v. Menon*, 137 S. Ct. 1504, 1507 (2017).  The

24    Convention states that it "shall apply in all cases, in civil or commercial matters, where there is

25    occasion to transmit a judicial or extrajudicial document for service abroad."  Art. 1.  As the

26    Supreme Court has noted, "[t]his language is mandatory," and compliance with the Convention is

27

28    ───────────────────────────────

[1] In a separate report, the undersigned will address ECF No. 35, Facebook's motion for entry of default against defendants Wei Gao and Zhaochun Liu.

1    required "in all cases to which it applies."  *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486

2    U.S. 694, 699 (1988).

3          Documents can be served under the Convention in several ways.  First, an applicant can

4    send a request for service to a receiving country's central authority, an entity that every signatory

5    to the Convention must establish.  The central authority must attempt to serve the defendant by a

6    method that is compatible with the receiving country's domestic laws, and then provide the

7    applicant with a certificate either confirming that service was successful or listing the reasons that

8    prevented service.  *See* Arts. 2–7.

9          Second, the Convention permits alternative methods of service unless the receiving

10   country objects.  These methods include service by diplomatic and consular agents, service

11   through consular channels, service on judicial officers in the receiving country, and direct service

12   "by postal channels."  Arts. 8–10.  China has objected to most of these alternative methods of

13   service, including service by postal channels.  *See China – Central Authority & Practical*

14   *Information*, Hague Conference on Private Int'l Law, https://www.hcch.net/en/states/en/states

15   /authorites/details3/?aid=243 (last visited July 28, 2020).

16         Third, the Convention permits countries to designate additional methods of service within

17   their borders, either unilaterally or through side agreements with each other.  *See* Arts. 11, 19.

18         Executed in the 1960s, the Convention doesn't reference service by e-mail.

19         Although compliance with the Convention is mandatory in all cases to which it applies,

20   there are several scenarios in which its channels of service may be bypassed.  First, by its terms,

21   the Convention doesn't apply "where the address of the person to be served with the document is

22   not known."  Art. 1.  Second, the Convention doesn't apply if service can be completed without

23   transmitting documents abroad (e.g., if substitute service on a domestic agent of the defendant is

24   valid under local law and completed).  *See Schlunk*, 486 U.S. at 700, 706–07.

25         Third, in the "case of urgency," the Convention permits courts to enter "provisional or

26   protective measures."  Art. 15.  Such measures have been interpreted to include "special forms of

27   service."  Notes of Advisory Committee on 1993 Amendment to Rule 4, subdivision (f)(3)

28   [hereinafter Rule 4 Notes].  Fourth, the Convention doesn't permit the receiving country to refuse

2

service "on the ground that, under its internal law, it claims exclusive jurisdiction over the subject-matter of the action or that its internal law would not permit the action upon which the application is based."  Art. 13.  If a receiving country doesn't abide by this rule, "special forms of service" may again be authorized.  Rule 4 Notes, subdivision (f)(3).

Fifth, if the plaintiff attempts to serve the defendant through a central authority and no certificate of any kind is received, the plaintiff can move for default judgment six months after initiating service.  *See* Art. 15 ¶ 2.  Alternatively in this scenario, the presiding judge "may direct a special method of service."  Rule 4 Notes, subdivision (f)(3).

Rule 4(f) gives effect to the Convention and its exceptions.  The rule has three subsections, which apply when an individual (or a corporation)[2] needs to be served outside the United States:

> Unless federal law provides otherwise, an individual . . . may be served at a place not within any judicial district of the United States:
>
> (1) by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;
>
> (2) if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice [including by a method prescribed by the foreign country's laws] . . . ; or
>
> (3) by other means not prohibited by international agreement, as the court orders.

Fed. R. Civ. P. 4(f).

Subsection (1) implements the Convention; subsection (2) identifies methods for serving persons in countries that are not members of the Convention; and subsection (3) "serves as a safety valve for unanticipated situations," 4B Charles A. Wright, Arthur R. Miller & Adam N. Steinman, *Federal Practice and Procedure* § 1133 (4th ed. April 2020 update), including when an exception to the Convention applies.

\\

\\

---

[2] *See* Fed. R. Civ. P. 4(h)(2) (permitting service on a corporation outside the United States by any means listed in Rule 4(f), except for personal delivery under Rule 4(f)(2)(C)(i)).

## II.

In March 2019, Facebook sued four companies and three people based in China for allegedly creating and selling fake Facebook and Instagram accounts that were used for misinformation campaigns and other scams.  According to Facebook, the four companies are affiliated with each other, and the three individuals are current or former owners, managers, or both of the companies.  *See* ECF No. 1, Compl. ¶¶ 1, 4–7, 23–24.

Facebook initiated service on one of the corporate defendants, 9 Xiu Network (Shenzhen) Technology Co., Ltd. ("9 Xiu"), and on the three individual defendants through the Hague Service Convention.  It sent requests for service, along with copies of the complaint, summons, and other case documents to China's central authority—the Ministry of Justice—which received the documents on June 17, 2019.  *See* ECF No. 35-2, Ingalls Decl. ¶ 9 & Exs. 1–2; ECF No. 40, Ingalls Supp. Decl. Exs. 1–3.

Facebook also e-mailed courtesy copies of the case documents to 9 Xiu and to the three individual defendants.  *See* ECF No. 35-3, Steele Decl. ¶ 3 & Ex. 1.  An e-mail dialogue started soon after with a representative of 9 Xiu, but 9 Xiu hasn't agreed to waive service of process.  *See id.* ¶¶ 6–8 & Exs. 3–7.  The individual defendants haven't responded to Facebook's e-mails.

In early March 2020, eight months after Facebook initiated service through the Convention, China's Ministry of Justice notified the company that it had attempted to serve 9 Xiu, but that service was unsuccessful because "[t]he recipient has moved, and the current address is unknown."  Ingalls Decl. Ex. 2, at 1.  The Ministry apparently reached this conclusion after speaking with a receptionist at 9 Xiu's service address, who said that 9 Xiu had moved.  *See* Mot., ECF No. 36 at 5.  Facebook has since conducted its own investigation and believes that the receptionist was lying or mistaken, that 9 Xiu is still located at the previously identified address, and that 9 Xiu is attempting to evade service.  *See* ECF No. 36-2, Hui Decl. ¶¶ 1–5.

In June 2020, one year after Facebook initiated service through the Convention, China's Ministry of Justice notified the company that it had also attempted to serve one of the individual defendants, Zhaoping Liu, but that service on Liu was unsuccessful because "[n]o such person [was] at the address provided."  Ingalls Supp. Decl. ¶ 5 & Ex. 4, at 1.

United States District Court
Northern District of California

1  As of the date of this report, China's Ministry of Justice has yet to provide Facebook with

2  a certificate of service (or of attempted service), or with an estimate of when service will be

3  attempted on the other two individual defendants, Wei Gao and Zhaochun Liu.  *See* Ingalls Decl.

4  ¶ 13(c); Ingalls Supp. Decl. ¶ 5.

5  Facebook, unsuccessful in its attempt to serve 9 Xiu and Zhaoping Liu through China's

6  Ministry of Justice, has asked the Court for leave to serve these defendants by e-mail, pursuant to

7  Rule 4(f)(3).  *See* ECF Nos. 36, 41.  In a different motion, which is not considered here, Facebook

8  has asked the Court to enter default against Wei Gao and Zhaochun Liu.  *See* ECF No. 35.

9  **III.**

10  The Court may authorize service by e-mail only if service by that means is "not prohibited

11  by international agreement."  Fed. R. Civ. P. 4(f)(3).  The relevant international agreement is the

12  Hague Service Convention, which, as noted above, doesn't mention service by e-mail one way or

13  another.  From that silence, Facebook concludes that the Convention, while not expressly

14  permitting service by e-mail, also doesn't prohibit it.

15  Many district courts have accepted this reading of the Convention and have authorized

16  service by e-mail on defendants in China under Rule 4(f)(3).[3]  The undersigned, however, believes

17  that this reading misinterprets the Convention and recommends that the district judge reject it.

18  A.

19  Courts holding that e-mail service on China-based defendants isn't prohibited by the

20  Hague Service Convention have based this conclusion, implicitly or explicitly, on a determination

21  that the methods of service delineated in the Convention are not exclusive.  So unless the

22  Convention expressly prohibits a method of service, these courts have held that it can conceivably

23

24  [3] *See, e.g.*, *Fourte Int'l Ltd. BVI v. Pin Shine Indus. Co.*, No. 18-CV-00297 BAS, 2019 WL 246562, at *1–3 (S.D. Cal. Jan. 17, 2019); *WeWork Cos. Inc. v. WePlus (Shanghai) Tech. Co.*, No. 5:18-CV-04543-EJD, 2019 WL 8810350, at *2–3 (N.D. Cal. Jan. 10, 2019); *Karsten Mfg. Corp. v. Store*, No. 18-CV-61624, 2018 WL 8060707, at *1 (S.D. Fla. July 26, 2018); *Keck v. Alibaba.com, Inc.*, No. 17-CV-05672-BLF, 2017 WL 10820533, at *2–3 (N.D. Cal. Dec. 20, 2017); *FKA Distrib. Co. v. Yisi Tech. Co.*, No. 17-CV-10226, 2017 WL 4129538, at *1 (E.D. Mich. Sept. 19, 2017); *Sulzer Mixpac AG v. Medenstar Indus. Co.*, 312 F.R.D. 329, 331–32 (S.D.N.Y. 2015); *Sec. & Exch. Comm'n v. China Sky One Med., Inc.*, No. 12-CV-07543 MWF, 2013 WL 12314508, at *2–3 (C.D. Cal. Aug. 20, 2013); *MacLean-Fogg Co. v. Ningbo Fastlink Equip. Co.*, No. 08-CV-2593, 2008 WL 5100414, at *2 (N.D. Ill. Dec. 1, 2008).

be authorized under Rule 4(f)(3).  *See, e.g.*, *Karsten Mfg.*, 2018 WL 8060707, at *1 (reasoning that because "the Hague Convention does not specifically preclude e-mail . . . service" that "[a] court acting under Rule 4(f)(3) therefore remains free to order . . . . service by e-mail").  The Convention, however, doesn't simply offer options for service abroad—options that plaintiffs can resort to or not at their discretion.  Rather, unless an exception applies, the Convention-delineated methods of service (along with the methods that countries unilaterally and bilaterally agree to under Articles 11 and 19) are exclusive.

This conclusion follows from the Convention's structure, which enumerates particular methods for serving documents abroad, and from its text, which states that the Convention "shall apply in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad."  Art. 1.  Using a method of service that is not enumerated in the Convention would be tantamount to not "apply[ing]" the Convention, which is expressly prohibited.  Or as Professor Gardner puts it: "As everyone agrees, the Convention is mandatory when it applies.  Thus, unless the Convention does not apply by its own terms, any method of service not approved by the Convention is effectively prohibited . . . ."  Maggie Gardner, *Parochial Procedure*, 69 Stan. L. Rev. 941, 1000 (2017) (footnote omitted).

To the extent there was any doubt about this interpretation, it was resolved in 2017 in *Water Splash*, 137 S. Ct. 1504, an opinion in which the Supreme Court considered "whether the Convention prohibit[s] service by mail," *id.* at 1507.  The Convention doesn't expressly prohibit service by mail; but the Court didn't find that fact conclusive, explaining that "the Hague Service Convention specifies certain approved methods of service and 'pre-empts inconsistent methods of service' wherever it applies."  *Id.*  The controlling question, then, was whether service by mail was among the "certain approved methods of service" specified in the Convention; if not, service by mail would have been prohibited.

The Court in *Water Splash* ultimately concluded that the Convention does permit service by mail—or in Convention parlance, service "by postal channels," Art. 10(a)—unless a country

1    affirmatively objects to service by this method.[4]  But the same conclusion can't be reached for

2    service by e-mail on defendants in China.  The Convention doesn't expressly permit service by e-

3    mail.  And although it has been suggested that service by e-mail could conceivably come within an

4    expansive reading of service "by postal channels," *see, e.g.*, Jeremy A. Colby, *You've Got Mail:*

5    *The Modern Trend Towards Universal Electronic Service of Process*, 51 Buff. L. Rev. 337, 352

6    n.60 (2003), China has affirmatively objected to service "by postal channels," so that reading,

7    even if accepted, wouldn't support service by e-mail on defendants in China.

8        Some courts have drawn a different conclusion from China's objection to service "by

9    postal channels."  Rather than suggesting that service by e-mail comes within the scope of service

10   "by postal channels," these courts have reasoned that China's objection to service "by postal

11   channels" is notable because it doesn't reach service by e-mail.  So, they reason, because China

12   affirmatively objected to service "by postal channels" but not to service by e-mail, service by e-

13   mail in China is not prohibited by the Convention.  *See, e.g.*, *Keck*, 2017 WL 10820533, at *3

14   ("Although Article 10(a) references 'postal channels,' it does not mention service by e-mail,

15   online messaging system, or other electronic means.  Thus, China's objection to service by 'postal

16   channels' does not prohibit service by 'electronic means.'"); *Sulzer Mixpac*, 312 F.R.D. at 332

17   ("China's objection to service by postal mail does not cover service by email . . . .").  This reading

18   of the Convention gets things backwards.  China affirmatively objected to service "by postal

19   channels" because service "by postal channels" is expressly permitted by the Convention, absent

20   objection.  The same is not true of service by e-mail.  The Convention doesn't offer service by e-

21   mail as an option, so there was no reason for China to affirmatively object to it.

22       Service by e-mail on defendants in China is not among the "approved methods of service"

23   specified in the Convention.  *Water Splash*, 137 S. Ct. at 1507.  This means that "[t]o permit

24   service by e-mail would bypass the means of service set forth in the Convention," *Anova Applied*

25

26   _____

27   [4] Article 10(a) uses the word "send" instead of "serve," and before *Water Splash* courts had split
     on whether this choice of words was intended to cabin the use of the postal channels to sending
     judicial documents abroad only after service of process was accomplished by some other means.
28   *See* 137 S. Ct. at 1508.

1    *Elecs., Inc. v. Hong King Grp., Ltd.*, 334 F.R.D. 465, 472 (D. Mass. 2020), which isn't permitted

2    unless an exception to the Convention applies.  *See Water Splash*, 137 S. Ct. at 1507; *see also*

3    *Schlunk*, 486 U.S. at 705 ("[C]ompliance with the Convention is mandatory in all cases to which it

4    applies.").

5                                              B.

6         Other courts have reasoned similarly, concluding that the Hague Service Convention, when

7    applicable, prohibits service by e-mail in China and in other countries that have objected to service

8    "by postal channels."  *See, e.g.*, *Anova*, 334 F.R.D. at 472 (holding that "e-mail service on [China-

9    based] defendants is prohibited by the Hague Convention"); *accord CRS Recovery, Inc. v. Laxton*,

10   No. 06-CV-7093 CW, 2008 WL 11383537, at *1–2 (N.D. Cal. Jan. 8, 2008); *see also Elobied v.*

11   *Baylock*, 299 F.R.D. 105, 106–08 (E.D. Pa. 2014) (same in Switzerland); *Compass Bank v. Katz*,

12   287 F.R.D. 392, 396–97 (S.D. Tex. 2012) (same in Mexico).  Yet this is a minority view.[5]

13        A reason for the tilt in the opposite direction is an overly broad reading of *Rio Properties,*

14   *Inc. v. Rio International Interlink*, 284 F.3d 1007 (9th Cir. 2002).  *Rio* interpreted Rule 4(f),

15   which, as noted above, provides three channels for serving persons outside the United States.

16   Subsection (1) permits service by means authorized by international agreement, including by the

17   Hague Service Convention; subsection (2) permits service in specified ways when there is no

18   international agreement, including by means permitted by the foreign country's laws; and

19   subsection (3) permits service "by other means not prohibited by international agreement, as the

20   court orders."  Fed. R. Civ. P. 4(f).

21        The plaintiff in *Rio* was based in the United States and attempted to serve a defendant in

22   Costa Rica.  Costa Rica isn't a signatory to the Hague Service Convention, so service under

23   4(f)(1) wasn't applicable.  Service under 4(f)(2), in contrast, was theoretically possible, but the

24   means of service identified in 4(f)(2) weren't practical under the circumstances; so rather than first

25   attempt service under 4(f)(2), the plaintiff asked the district court to authorize service by e-mail

26

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [5] *See* n. 3, *infra* (listing decisions that have permitted e-mail service in China); *see also* Michael A.
     Rosenhouse, *Permissibility of Effectuating Service of Process by Email Between Parties to Hague*
28   *Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial*
     *Matters*, 14 A.L.R. Fed. 3d Art. 8 (West 2016) (cataloging decisions on both sides of the split).

under 4(f)(3), which the district court agreed to do.  *See* 284 F.3d at 1012–14.

The Costa Rican defendant challenged the sufficiency of service, asserting that the plaintiff should have first attempted service by one of the methods delineated in 4(f)(2) before resorting to 4(f)(3).  The district court and the Ninth Circuit rejected this argument, with the Ninth Circuit holding that Rule 4(f) doesn't require a plaintiff to pursue service under 4(f)(1) or 4(f)(2) before requesting an alternative means of service under 4(f)(3).

The Ninth Circuit's holding was driven by three observations.  First, looking to the structure of Rule 4(f), the court noted that each subsection was "separated from the one previous merely by the simple conjunction 'or,'" suggesting that 4(f)(3) was "not subsumed within or in any way dominated by Rule 4(f)'s other subsections . . . ."  *Id.* at 1015.  Second, examining Rule 4(f)'s text, the court noted that "no language in . . . 4(f)(1) or 4(f)(2) indicates their primacy," and that 4(f)(3) "includes no qualifiers or limitations which indicate its availability only after attempting service of process by other means."  *Id.*  Third, the court considered the Advisory Committee's notes, which indicated that at least in certain circumstances district courts could use 4(f)(3) "to order a 'special method of service,' even if other methods of service remain incomplete or unattempted."  *Id.* (quoting Rule 4 Notes, subdivision (f)(3)).  Together, these observations led the court to conclude that service under 4(f)(3) "is neither a 'last resort' nor 'extraordinary relief.'  It is merely one means among several which enables service of process on an international defendant."  *Id.* (citation omitted).

It is easy to understand why courts, after reading *Rio*, have concluded that the methods of service identified in the Hague Service Convention are not exclusive.[6]  Service under the Convention proceeds through 4(f)(1); and *Rio* held that Rule 4(f) doesn't prohibit a plaintiff from bypassing 4(f)(1) and first requesting an alternative means of service, such as service by e-mail, under 4(f)(3).  The implication seems to be that the methods of service identified in the

---

[6] *See, e.g.*, *WeWork*, 2019 WL 8810350, at *2–3; *WhosHere, Inc. v. Orun*, No. 13-CV-00526 AJT, 2014 WL 670817, at *2–3 (E.D. Va. Feb. 20, 2014); *Feyko v. Yuhe Int'l, Inc.*, No. 11-CV-05511 DDP, 2013 WL 5142362, at *1–2 (C.D. Cal. Sept. 12, 2013); *Gurung v. Malhotra*, 279 F.R.D. 215, 219–20 (S.D.N.Y. 2011); *Williams-Sonoma Inc. v. Friendfinder Inc.*, No. 06-CV-06572 JSW, 2007 WL 1140639, at *2 (N.D. Cal. Apr. 17, 2007).

1   Convention are optional, and that even if the Convention applies, service by e-mail may be

2   utilized if approved by the court.

3          This reading of *Rio*, although understandable, is too expansive.  *Rio* interpreted Rule 4(f),

4   not the Hague Service Convention; and when the Convention applies, it must be considered.  The

5   Convention is a ratified, self-executing treaty, and as such is "the supreme law of the land."

6   *Ackermann v. Levine*, 788 F.2d 830, 838 (2d Cir. 1986) (citation omitted); *see also Trask v. Serv.*

7   *Merch. Co.*, 135 F.R.D. 17, 21 (D. Mass. 1991) (identifying the Convention as "self-executing").

8   And when there is tension between a federal statute or federal rule, on the one hand, and a treaty

9   like the Convention, on the other, the two are to be interpreted "to avoid conflicts."  *Saleh v. Bush*,

10  848 F.3d 880, 891–92 & n. 9 (9th Cir. 2017).

11         The Convention, as noted above, delineates particular channels for service of process and

12  expressly states that it "shall apply in all cases, in civil or commercial matters, where there is

13  occasion to transmit a judicial or extrajudicial document for service abroad."  Art. 1.  How is this

14  command of preeminence to be squared with *Rio*'s interpretation of Rule 4(f)?  The Advisory

15  Committee's notes provide the roadmap.

16         Critically, in discussing 4(f)(1), the Advisory Committee's notes confirm that "[u]se of the

17  Convention procedures, when available, is mandatory if documents must be transmitted abroad to

18  effect service."  Rule 4 Notes, subdivision (f)(1).  This directive is consistent with the Convention,

19  and it means that when the Convention applies—which it didn't in *Rio*—service under 4(f)(1) is

20  indeed preferred over service under 4(f)(2) and 4(f)(3).  Rule 4(f) may be silent on this preference,

21  but the Convention and the Advisory Committee's notes are not.

22         The notes go on to recognize that there will be times when the Convention-delineated

23  methods of service can be bypassed.  As noted above, the Convention expressly permits the court

24  to order provisional or protective measures "in case of urgency," Art. 15; it generally forbids the

25  central authority from refusing to execute service for substantive reasons, *see* Art. 13; and it

26  permits the court to enter default judgment if the central authority never provides a certificate of

27  attempted service, *see* Art. 15 ¶ 2.  In each of these instances, the court can "authorize[] special

28  forms of service" under 4(f)(3), even if those forms are "not explicitly authorized by international

10

agreement." Rule 4 Notes, subdivision (f)(3).

These exceptions, however, are not limitless. They are either expressly identified in the Convention or they arise when the receiving country doesn't comply with the Convention. The exceptions, then, don't mean that the court and the plaintiff can regularly circumvent 4(f)(1). That interpretation would render the Convention optional, which the Advisory Committee's notes make clear is not the case.

Reading 4(f)(3) as permitting alternative means of service only when an exception to the Convention applies or when the Convention isn't implicated (e.g., because the defendant is based in a country that isn't a signatory to the Convention) doesn't conflict with *Rio*. This interpretation recognizes, as *Rio* did, that alternative means of service may sometimes be pursued under 4(f)(3) without first attempting service under 4(f)(1) or 4(f)(2). On these occasions, "Rule 4(f)(3) is neither a 'last resort' nor 'extraordinary relief.'" *Rio*, 284 F.3d at 1015. But when the Convention applies and no exception is applicable, the plaintiff cannot invoke 4(f)(3); for "[u]se of the Convention procedures, when available, is mandatory if documents must be transmitted abroad to effect service." Rule 4 Notes, subdivision (f)(1).

Professor Gardner has drawn the same conclusion. Noting that "some district courts have . . . relied on *Rio* to conclude that, even when the Service Convention *does* apply, plaintiffs can immediately invoke Rule 4(f)(3) to seek approval to serve foreign defendants through less formal means, like e-mail or Facebook," she explains that "[t]hat extension of *Rio*'s dicta is wrong under Rule 4 and violates the Service Convention." Gardner, *supra* p. 6, at 999. For as she points out, the Convention's methods of service are "mandatory when [they] appl[y]," and the "Advisory Committee's notes to Rule 4(f) make clear that Rule 4(f)(3) was intended as a safety valve available only when the Convention, by its own terms, does not apply." *Id.* at 999–1000.

Service by e-mail on defendants in China is not one of the Hague Service Convention's approved methods of service. Thus, unless an exception to the Convention applies, service by e-mail on the China-based defendants in question here cannot be authorized under Rule 4(f)(3).

\\

\\

United States District Court
Northern District of California

**IV.**

Facebook hasn't asserted that an exception to the Hague Service Convention applies.  On the undersigned's own review, the exception that comes closest to being implicated is the exception for when the defendant's address is unknown.  *See* Art. 1.  For as noted above, China's Ministry of Justice didn't find 9 Xiu and Zhaoping Liu at the addresses Facebook identified. Facebook, however, hasn't argued that Zhaoping Liu's address is unknown, and the company has affirmatively asserted that, despite the Ministry's report, 9 Xiu's address *is* known.  *See* Hui Decl. ¶¶ 3–6.[7]

The other exceptions to the Convention also are not applicable.  No domestic agent of the defendants has been identified; Facebook hasn't suggested that this is a case of urgency; China hasn't refused to serve the defendants for substantive reasons; and although China's Ministry of Justice did take longer than six months to provide Facebook with return certificates of attempted service on 9 Xiu and Zhaoping Liu, it ultimately did provide those certificates, so this is not an instance in which "no certificate of any kind has been received."  Art. 15 ¶ (2)(c).

Because Facebook has not established that an exception to the Convention applies, service must be accomplished through one of the channels identified within Convention.  Direct service on a defendant in China through the defendant's e-mail address is not one of those channels, so Facebook's motion for an order authorizing service by e-mail should be denied.

Admittedly, this is not the most practical result.  It delays the litigation further because Facebook will likely need to reengage with China's Ministry of Justice, a governmental body that has yet to move with haste in the case.  This result may also seem "shockingly out-of-step with today's fast-paced e-commerce."  *NOCO Co. v. Liu Chang*, No. 18-CV-2561, 2019 WL 2135665, at *5 (N.D. Ohio May 16, 2019).  And one can also sympathize with Facebook over the

---

[7] If Facebook later asserts that 9 Xiu's and Zhaoping Liu's addresses are unknown, it should offer evidence to support a showing of "reasonable diligence in attempting to discover [these] address[es]."  *Indagro, S.A. v. Nilva*, No. 07-CV-03742 SDW, 2014 WL 1515587, at *4 (D.N.J. Apr. 17, 2014) (collecting cases in which such a showing was required before the court would hold that the defendant's address was unknown and that the Convention didn't apply).  As to 9 Xiu, much of this evidence is already in the record; but no similar evidence has been submitted for Zhaoping Liu.

difficulties of attempting to track down foreign defendants who may be trying to evade service.

These practicalities, however, must yield to the Convention's rules.  Those rules are mandatory, and the undersigned agrees that "the systemic comity interests embodied in the Service Convention" shouldn't be sacrificed in the name of "concrete case management concerns."  Gardner, *supra* p. 6, at 1002; *see also NOCO*, 2019 WL 2135665, at * 5 ("[T]he Court's hands are tied.  Plaintiff NOCO must serve Defendant Chang through China's Ministry of Justice.").

Also, in the long run, the Convention's rules may benefit Facebook.  As the Supreme Court has noted, "parties that comply with the Convention ultimately may find it easier to enforce their judgments abroad."  *Schlunk*, 486 U.S. at 706.  This is because the Convention's signatories have agreed to its methods of service, but not necessarily to alternatives.

Here, then, although service by e-mail would be faster, it might lead to an unenforceable judgment—an outcome that doesn't seem improbable given that service by e-mail is prohibited in China.  *See China – Central Authority & Practical Information – Frequently Asked Questions*, Hague Conference on Private Int'l Law, https://assets.hcch.net/docs/5bbc302d-532b-40b1-9379-a2ccbd7479d6.pdf (last visited July 28, 2020) (Q. "Is [a] request transferred by email acceptable to Chinese Central Authority?"  A. "No.  According to the Chinese Civil Procedure Law, the court officer must serve the original hardcopies of the judicial documents on the recipient.  Therefore, scanned copies transferred by email . . . [are] not acceptable.").

To be clear, if China's Ministry of Justice is not willing to further engage with Facebook in its attempts to serve 9 Xiu and Zhaoping Liu, or if it turns out that 9 Xiu's and Zhaoping Liu's addresses are indeed unknown, then an exception to the Convention may ultimately apply, which may open the door to alternative means of service under Rule 4(f)(3).  At this stage, however, resort to Rule 4(f)(3) would be premature.

**V.**

Facebook hasn't asserted that an exception to the Hague Service Convention is applicable; and under the Convention, service by e-mail on defendants in China is prohibited.  As a result, the undersigned recommends that Judge Tigar deny Facebook's motion for an order authorizing service by e-mail on defendants 9 Xiu and Zhaoping Liu.  Any party may object to this

recommendation within fourteen days of receiving it.  *See* Fed. R. Civ. P. 72(a); Civil L.R. 72-2.

       **IT IS SO RECOMMENDED.**

Dated:   July 28, 2020

_____
ALEX G. TSE
United States Magistrate Judge

United States District Court
Northern District of California